UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PHYLLIS HARVEY-BUSCHEL,

Plaintiff,

v.

UNIVERSITY OF WASHINGTON,

Defendant.

Cause No. C20-1775RSL

ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on "Defendant's Motion for Summary Judgment." Dkt. # 47. Plaintiff is a former employee of the University of Washington, where she worked as a Continuing Education Coordinator for the Washington State Mathematics, Engineering and Science Achievement ("MESA") program. MESA is a statewide program designed to increase the number of underrepresented minorities and women in science, technology, engineering, and math ("STEM"). Plaintiff oversaw the organization's  contracts with regional MESA K-12 centers, providing and managing grant funding for curriculum development and otherwise assisting the centers in serving the needs of the target student population. On October 16, 2019, plaintiff was laid off as part of a reorganization that eliminated all existing staff positions in favor of four new staff positions. Plaintiff filed this lawsuit on December 3, 2020, asserting claims of disparate treatment, retaliation, and hostile work environment under Title VII and the

Washington Law Against Discrimination ("WLAD"), wrongful termination in violation of public policy, and violations of the Washington Equal Pay and Opportunities Act ("EPOA"). Defendant seeks summary judgment on all of plaintiff's claims.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018). Although the Court must reserve for the trier of fact genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir.

2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable fact finder could return a verdict in its favor. *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1071 (9th Cir. 2019).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] and taking the evidence in the light most favorable to plaintiff, the Court finds as follows:

**BACKGROUND**

Until Gregory King was hired in February 2019 as the new Executive Director of MESA, plaintiff and the rest of the MESA staff were performing admirably despite significant funding limitations. In 2017, the MESA team was awarded the University's highest staff honor in recognition of those who "help improve our community[] and the world through their hard work, dedication, and selfless spirit." Dkt. # 56-1 at 2. Rickey Hall, the Vice President of the University's Office of Minority Affairs and Diversity ("OMA&D") where MESA is housed, congratulated the team on the recognition of their "good and impactful work." *Id.* According to Abel Pacheco, the Director of Strategic Engagement in OMA&D who nominated the team for the award, plaintiff

> is creative, brilliant, and kind. She works tirelessly with educators across Washington State, advocating for equity in STEM education for underrepresented students. She works long hours creating STEM curriculum that is engaging, culturally relevant, and relatable for MESA students. She partners with public school educators and administrators statewide to implement MESA programming and curriculum. You can see the admiration and respect being reciprocated

[1] This matter can be decided on the papers submitted. Plaintiff's request for oral argument is DENIED.

> between Phyllis and the teachers she partners with when they are working together. The type of leadership and partnership that Phyllis demonstrates in her work is unparalleled and truly helps to ensure the success of MESA programming, as well as the service provided to MESA students.

Dkt. # 56-2 at 3. Plaintiff's 2017-2018 performance review was glowing: she is described as "self-directed, well organized and consistent," an "ideal collaborator and colleague," and a "visionary and strategic thinker" with a "laser focus[] on the needs of both students and teachers [to whom she] consistently deliver[s] high quality STEM programming and services, " all with an exemplary overall work performance. Dkt. # 56-3 at 4.

Defendant points out that it had become clear as early as 2015 that MESA had stagnated, prompting its then-Executive Director, James Dorsey, to hire a consulting agency to assess the program and make recommendations. Dorsey opted to make only minimal adjustments following the review, despite pressure from Patricia Loera, the Associate Vice President of College Access to whom Dorsey reported, to improve fiscal compliance, data management, and the tracking and reporting of student outcomes. When Dorsey resigned in July 2018, he acknowledged that some issues identified in the consultant's report "should remain a priority for process improvement and operational effectiveness," including data collection, an operational gap, and staffing capacity. Dkt. # 49 at 15.

When King took over the role of Executive Director in February 2019, he was instructed by Hall to assess MESA's strengths, accomplishments, and areas of growth and to implement any needed improvements. King discovered that Dorsey's lax management style supported a happy workforce but generated a history of compliance, fiscal, and budget issues. As King

began to call out questionable practices and tighten the reins (for example, he began requiring staff to respond to his inquiries within 15 minutes and to let him know if they were going to be taking vacation or sick leave pursuant to OMA&D's policies), the MESA staff grew more and more unhappy.

When King began discussing the need to reorganize the office to (a) create new positions to focus on data collection, analysis, outcomes, development, and financial/technical oversight and (b) consolidate the position that supported K-12 programming (the position held by plaintiff) with the position that supported community college programming (the position held by Lucy Casale), staff dissatisfaction increased. Casale and plaintiff took affirmative steps to undermine King, or to at least forestall his reorganization plans, meeting with regional MESA directors, complaining to MESA Advisory Board members, and lodging complaints with human resources, Hall, and the University Complaint Investigation and Resolution Office ("UCIRO").

During approximately the same time period, King stepped into an on-going process designed to review plaintiff's job duties and responsibilities and ensure that her official position and grade encompassed those activities. Plaintiff was hired in 2009 as a "Government Relations/Curriculum Coordinator." Over the years, she had taken on increased duties and began using the more accurate title "Director of K-12 Program" in 2015 with the approval of Dorsey. Dkt. # 56 at ¶ 5. When Dorsey left MESA in 2018, he and plaintiff were once again attempting to change her official job description/classification to reflect the role she was actually performing. Plaintiff hoped the reclassification would come with or lead to a pay increase and

greater opportunities for career advancement. Plaintiff also made a request for a temporary pay increase to compensate for the increased workload following Dorsey's departure. Dkt. # 56 at ¶ 8. The request was denied,[2] and Hall and/or Loera made it clear that they were not supportive of any job description/classification changes that would result in an increase in compensation. Dkt. # 56 at ¶ 7-8.

Plaintiff's request for a position review began to move forward again after King was hired as the new Executive Director.[3] When King requested additional documentation in mid-March regarding plaintiff's job duties and activities so that he could complete his portion of the paperwork, plaintiff felt that the request reflected a lack of trust regarding her responsibilities and activities. She demanded to know why King needed additional information and reminded him that he had been her supervisor for only a few weeks. The interaction did not go well: both King and plaintiff reported the incident to human resources. Plaintiff complained that King was bullying and harassing her. Dkt. # 56 at ¶ 11. King reported that plaintiff was being unprofessional, aggressive, hostile, and combative. Dkt. # 48 at ¶ 28. During the subsequent investigation of plaintiff's complaint in April, she reported that she felt King was discriminating against her because of her age and possibly her gender based on "several (more than ten)

---

[2] Plaintiff asserts that the temporary pay increase requests of her MESA co-workers were granted and she was told that Loera denied her request because she was already the most highly paid MESA staff member. Dkt. # 52 at 233.

[3] Plaintiff asserts that the position review process had been unjustifiably delayed for at least three months when Leora and/or Hall decided not to take any action until a new Executive Director was hired.

comments referring to [plaintiff's] work as 'outdated' or 'useless' or 'old'" [4] and manifestations of low regard toward the female members of the MESA team, such as "yelling at us down the hall to come to his office, raising his voice when speaking to us, and standing over us in intimidating ways." Dkt. # 56 at ¶ 12. *See also* Dkt. # 57-1 at p. 28-31 (Casale responding to defense counsel's efforts to minimize the "outdated" comments: "You don't have to say anything about age to let someone know that, you know, you think that that person is outdated and ready – you know, for the junk heap"). King first began considering layoffs as part of the MESA reorganization in May. Dkt. # 57-8 at p. 45.

In April or May 2019, University Compensation was involved in both the review of plaintiff's position/classification and discussions regarding new positions in a reorganized MESA. University Compensation advised King that some of the work described for one of the "new" positions was duplicative of work plaintiff was then performing and that, if the work

---

[4] Plaintiff was not the only one who got the feeling that King was discriminating against her and the other MESA staff (all of whom were over 55 years old). A MESA Center Director, JR Nobles, noticed early on that something wasn't right. Although he cannot now remember the exact words used, he remembers how they made him feel:

> [M]y conclusion at the time was that it was being done because of age. And the evidence[] of the behavior were that they were in stark contrast – suddenly – suddenly, people who had been of high value were no longer of any value, and we were not allowed to communicate with them. And there were other statements that were made that were derogatory statements by Gregory. I didn't write them down. I wish I would have documented them more at the time, but that indicated that – yeah.
>
> I – I remember being uncomfortable when the statements were made. We were in the room at – in the OMAD office, and I think this is one of the first meetings when [King] was – I think this was maybe the only meeting that we had with him in person early on. And I can't recall the statements, but there were things that made me uncomfortable.

Dkt. # 57-12 at pp. 106-07.

were necessary for the organization, King should retain plaintiff in the role. Dkt. # 57-6 at pp. 78. The job descriptions changed as the reorganization took shape, however, and were no longer duplicative when approved by University Compensation. Dkt. # 57-6 at pp. 113-15. Human resources subsequently raised other concerns, inquiring how the proposed reorganization would achieve the cost savings and financial benefits King claimed and questioning why it was deemed beneficial to hire consultants for curriculum development instead of having plaintiff continue to do the work. Dkt. # 23 at 48-57.

In June 2019, plaintiff lodged a complaint with UCIRO. She asserted that her work environment became very stressful after making her March 2019 complaint against King, that he gave her a two minute evaluation conference, and that she had reported his retaliatory conduct to human resources to no avail. Dkt. # 52 at 234.[5] Plaintiff alleged that OMA&D leadership had "shown that there is a preference to hire, promote and provide incentives to employees from mostly one specific ethnicity, with a general tendency to marginalize, discriminate and treat with bias other staff." Dkt. # 52 at 234.[6] She sought UCIRO's help in obtaining a fair and unbiased

---

[5] Plaintiff had previously complained to human resources about the performance evaluation, noting that King's "dismissiveness and lack of interest in any discussion" made her "concerned that I am being retaliated against." Dkt. # 57-8 at 42-45. There is also evidence in the record that King had prohibited MESA's administrative staff from assisting plaintiff, had prohibited plaintiff from visiting MESA Centers, conducting one-on-one teacher training, or meeting with Center Directors, and was publicly insulting to and dismissive of plaintiff. Dkt. # 57-2 at pp. 87-88; Dkt. # 57-1 at pp. 106-11; Dkt. # 61 at ¶ 7.

[6] There is evidence in the record that King called plaintiff, who is from Jamaica, "the island girl" or referred to her conduct as "the island way" or her style "as island style." Dkt. #57-1 at p. 32; Dkt. # 57-10 at p. 245

decision on her position review request (which was still under consideration at the time) and an inquiry regarding why OMA&D leadership had been hostile to her request for reclassification and dismissive of her concern that she had been working outside the scope of her job duties for approximately five years. Plaintiff expressed her interest in "speaking with [UCIRO] more about this Employment bias and discriminatory Treatment." Dkt. # 52 at 234-35.

Ultimately University Compensation concluded that the job duties plaintiff was performing fell within the scope of her original 2009 classification as a Curriculum Education Coordinator, Grade 9. Dkt. # 57-6 at p. 84-86. Plaintiff believes the entire process was plagued with procedural irregularities and was unnecessarily lengthy, onerous, and hostile. Following the rejection of her reclassification request, plaintiff stopped performing tasks that she deemed to be outside the scope of her position, notwithstanding University Compensation's recent determination that she was properly classified based on those very duties and responsibilities. In September 2019, King confirmed that tasks were not getting done and agreed to investigate whether plaintiff had received a temporary pay increase for the "extra" duties in the past. Dkt. # 56-10 at 3.

In August 2019, plaintiff and her MESA co-workers, Casale and Ku'ulani Seto, wrote to Hall "to let [him] know of the work situation that the MESA State staff ha[d] been subjected to over the past seven months." Dkt. # 50 at 13-15. The letter focused on King's management style, but pointed out that the three authors are all over 50 years of age, had heard rumors that they

would be forced out, and had cause to believe that their replacement with less costly staff would reflect age discrimination.

By October 2019, the plan for reorganizing MESA had been approved. On October 16, 2019, all MESA staff were laid off. The new positions were posted a few weeks later. Plaintiff did not apply for any of the new positions. Plaintiff and her former colleagues were all over the age of 55 when the University decided MESA had to be reorganized in such a way that they were all terminated. The person who was hired to fill the new K-14 Director position (a combination of the positions held by plaintiff and Casale) was 48 years old. Dkt. # 57-16 at pp. 7-8.

UCIRO concluded its investigation of plaintiff's June 2019 complaint in July 2020. UCIRO found no violation of the University's antiharassment, antidiscrimination, and antiretaliation policies (Dkt. # 57-11 at p. 21), but it concluded that some of King's interactions with staff did not meet an acceptable professional standard and noted "another concerning theme that came up was what could be viewed as coded age-related language" (Dkt. # 57-11 at p. 33).

## DISCUSSION

### A. Discrimination Under Title VII and WLAD[7]

A person suffers disparate treatment in employment "when he or she is singled out and treated less favorably than others similarly situated on account of" a protected category such as

[7] Plaintiff's disparate treatment claim under Title VII is limited to national origin discrimination. Age is not a protected category under Title VII, and plaintiff failed to exhaust her administrative remedies with regards to her federal gender discrimination claim.

age, gender, or national origin. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir. 2004) (internal quotation marks and citation omitted). Under the first prong of the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, thereby raising a presumption of discrimination. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446 (2014). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008); *Grimwood v. Univ. of Puget Sound, Inc*., 110 Wn.2d 355, 363-64 (1988). "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the *McDonnell Douglas* presumption of unlawful discrimination 'simply drops out of the picture.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). At that point, "the ultimate question" remains whether there is a triable issue regarding whether the employer intentionally discriminated against her. *St. Mary's Honor Ctr.*, 509 U.S. at 511.

To establish a *prima facie* case of discrimination, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by the anti-discrimination statutes; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) "similarly situated individuals outside [plaintiff's] protected class were treated more favorably, or other circumstances surrounding the adverse employment action

give rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted). It is undisputed that plaintiff belongs to various protected classes: she is a woman, she is over the age of 40, and she is from Jamaica. It is also undisputed that she was performing her job satisfactorily and that her employment was terminated. The issue is whether the circumstances of the termination give rise to an inference of discrimination based on gender, age, and/or national origin.

Based on the evidence in the record, a reasonable jury could find that plaintiff was terminated because of her age. The language King used when justifying the proposed reorganization and describing the shortcomings in plaintiff's performance/qualifications (including references to the financial benefits of replacing plaintiff and her "outdated" or "old" ideas), third party testimony regarding their contemporaneous impression that King's interactions with plaintiff reflected an age bias, and the fact that every person terminated in the reorganization was within the protected age group create a triable issue of fact regarding defendant's actual motivations. The same cannot be said for plaintiff's gender and national origin claims, however. Plaintiff's evidence in that regard is limited to boorish behavior or comments having nothing to do with the reorganization, and the adverse employment action

equally impacted individuals inside and outside of these protected classes.[8] Plaintiff's gender and national origin claims will, therefore, be dismissed. Only her age discrimination claim under the WLAD will be permitted to proceed.

**B. Retaliation in Violation of Title VII and WLAD**

"To establish a *prima facie* case of retaliation, an employee must show three things: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411 (2018) (citations omitted). *See Davis v. Team Elec. Co*., 520 F.3d 1080, 1093 (9th Cir. 2008). Plaintiff argues that King retaliated against her for her March 14, 2019, complaint to human resources by making her work environment unpleasant, taking away resources and job duties, and opting to terminate her employment rather than giving her a position in the reorganized MESA.

There is no evidence that plaintiff's March 2019 complaint involved anything other than a complaint about King's management style and what plaintiff deemed to be his unnecessary demands. Plaintiff states that she first disclosed her concern regarding "age and possibly gender" discrimination on April 5, 2019, during an interview with human resources. Dkt. # 56 at ¶ 12. By that point in time, King was already yelling at plaintiff, dismissing her work as outdated and useless, and preventing her from getting assistance from Seto. *Id.*; Dkt. # 57-1 at p. 98; Dkt. # 57-2 at p. 87. A complaint made after these negative events occurred is causally unrelated to

[8] Casale is a Caucasian woman and Seto is a Hawaiian man of Chinese ancestry.

the negative events. King had also proposed combining plaintiff and Casale's positions a month earlier and was moving forward with the reorganization plan. Dkt. # 54 at ¶ 4. When, exactly, he decided that plaintiff's employment would be terminated as part of the reorganization is not clear, but the decision was made no later than April or May 2019 when University Compensation commented on the proposed reorganization. King remained unaware that plaintiff had engaged in protected activity until at least June 2019, however. Although he knew that plaintiff had complained about his management style, he did not know that she had alleged any form of discrimination or harassment until he received a letter from UCIRO in August 2019 (or possibly when she intimated that she believed her performance evaluation was retaliatory in June 2019). Dkt. # 67 at ¶ 2. "[A]n employer cannot retaliate against an employee for an action of which the employer is unaware." *Cornell*, 192 Wn.2d at 414. In the absence of evidence suggesting a causal connection between the April 2019 protected activity and the allegedly retaliatory conduct, this claim fails as a matter of law.

**C. Hostile Work Environment Under WLAD[9]**

Plaintiff argues that she was subjected to age-coded comments, sporadic "island" references, yelling, rudeness, the devaluing of her contributions, a prohibition on using administrative staff, and the removal of job duties after King took over as Executive Director. To establish a *prima facie* hostile work environment claim, plaintiff must show that "(1) the

[9] Plaintiff does not oppose defendant's motion for summary dismissal of the hostile work environment claim under Title VII.

harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.*" Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275 (citation omitted).

> To determine whether conduct was severe or pervasive enough to affect the terms and conditions of employment, we look at the totality of the circumstances, including the frequency and severity of harassing conduct, whether it was physically threatening or humiliating, or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Washington v. The Boeing Co.*, 105 Wn. App. 1, 10 (2000). Whether offensive comments affect the conditions of employment is a factual question. *See Davis v. West One Auto. Group*, 140 Wn. App. 449, 457 (2007) (holding that employee's alleged humiliation and self-diagnosed mental sickness from "racially charged" workplace comments raised inference that condition resulted from hostile work environment). But casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. *Washington*, 105 Wn. App. at 10.

*Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 751 (2013). While the comments and hostile interactions of which plaintiff complains might not be enough, standing alone, to affect the terms or conditions of her employment, when coupled with the alleged changes to her duties and reduction of available resources, a reasonable jury could conclude that the conduct was sufficiently pervasive to create a hostile work environment. Defendant is not entitled to summary dismissal of this claim.

**D. Retaliation in Violation of Equal Pay and Opportunities Act**

The EPOA precludes employers from retaliating against an employee for "inquiring about . . . the employee's wages or the wages of any other employee" or "asking the employer to provide a reason for the employee's wages or lack of opportunity for advancement." RCW49.58.040(2)(a) and (b). Plaintiff's theory seems to be that Hall and Leora directed King to assess and improve the MESA office in retaliation for her request for a position review which she hoped – and her superiors feared -- would result in a pay increase. The parties have not identified, and the Court has not found, any cases interpreting the subsections of the EPOA on which plaintiff relies. The Court finds, however, that a request that the employer accurately describe an employee's job responsibilities so that her title and pay grade can be adjusted is reasonably similar to a request that the employer provide a reason for the employee's wages and/or lack of advancement, especially where the legislature has determined that "policies that encourage retaliation or discipline towards workers who discuss or inquire about compensation prevent workers from moving forward." RCW 49.58.005.

Defendant points out that plaintiff took pains to avoid a direct discussion regarding her pay, instead focusing the request on obtaining a new job description. There is ample evidence, however, that everyone was aware that an expansion of plaintiff's official job duties or her elevation to Assistant Director could not only result in a pay raise, but might also trigger a retroactive increase. Defendant further argues that the EPOA claim fails in these circumstances because it granted plaintiff's request for a position review, because there is no evidence that her

position was eliminated because of her request, and because Hall and Leora's remarks discouraging her from openly pursuing a pay increase do not give rise to an inference of retaliation. Taking the evidence in the light most favorable to plaintiff, a reasonable fact finder could conclude that plaintiff's requests for a temporary pay increase after Dorsey resigned and her pursuit of a new job description and title that would likely come with a permanent pay increase were causally connect to Hall and Leora's instructions to King and that cost-savings were a priority in King's assessment and reorganization of MESA. Summary judgment as a matter of law is not appropriate.

**E. Wrongful Discharge in Violation of Public Policy**

As discussed above, plaintiff has raised a genuine issue of material fact regarding her EPOA claim. If she is able to prove at trial that her job was eliminated because she had requested a position review (and related pay increase), her claim would fall within one of the scenarios justifying a departure from the terminable-at-will doctrine. *Becker v. Cmty. Health Sys., Inc.*, 184 Wn.2d 252, 258-59 (2015) (recognizing wrongful discharge in violation of public policy where an employee is fired for exercising a legal right or privilege); *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 207 (2008).

For all of the foregoing reasons, defendant's motion for summary judgment (Dkt. # 47) is GRANTED in part and DENIED in part. Plaintiff has raised genuine issues of material fact regarding her WLAD age discrimination and hostile work environment claims, her EPOA claim,

and her wrongful discharge in violation of public policy claim. All other claims are DISMISSED.

Dated this 11th day of April, 2022.

Robert S. Lasnik
United States District Judge